UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMES TOUHEY,                          )
                                       )
        Plaintiff(s),                  )
                                       )
    vs.                                )          Case No. 4:10CV1440 JCH
                                       )
HARTFORD LIFE AND ACCIDENT             )
INSURANCE COMPANY, et al.,             )
                                       )
        Defendant(s).                  )

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff's Motion for Summary Judgment, and Defendants

Hartford Life and Accident Insurance Company and Hartford Life and Accident Insurance Company,

GBD Claim and Service Operations'[1] (hereinafter "Hartford") Motion for Summary Judgment, both

filed December 3, 2012. (ECF Nos. 71, 67). The motions are fully briefed and ready for disposition.

## BACKGROUND

From June 2, 2003, to May 17, 2007, Plaintiff James Touhey was employed by Maryville

University of St. Louis ("Maryville") as a Development Director--Planned Giving (fundraiser).

(Complaint ("Compl."), ¶¶ 4, 9; Hartford's Statement of Uncontroverted Material Fact ("Hartford's

Facts"), ¶¶ 2, 3). In 2003, Maryville offered the Maryville University of St. Louis Group Disability

Income Insurance Plan (the "2003 Plan"). (Hartford's Facts, ¶ 4). The 2003 Plan was an employee

welfare benefit plan within the meaning of the Employee Retirement Income Security Act of 1974,

as amended, 29 U.S.C. § 1001 et seq. ("ERISA"). (Id., ¶ 5; Compl., ¶¶ 1, 4). The 2003 Plan was

---

[1] According to Hartford, although Plaintiff attempted to name "GBD Claim and Service Operations" as a Defendant, Hartford Life and Accident Insurance Company, GBD (Group Benefits Division) Claim and Service Operations is an operating division of Hartford, not a separate legal entity. (Hartford's Motion for Summary Judgment, P. 1 n. 1).

funded by a policy of insurance issued by Hartford Life Group Insurance Company[2], Group Insurance Policy No. 83154375, effective February 1, 2003 (the "2003 Policy"). (Hartford's Facts, ¶ 6). Hartford Life and Accident Insurance Company later issued Policy No. GLT-394044 to Maryville, effective March 1, 2007 (the "2007 Policy"), to fund benefits under the 2003 Plan, which in turn was amended and renamed the Group Long Term Disability, Basic Term Life, Supplemental Dependent Life, Supplemental Term Life, Basic Accidental Death and Dismemberment Plan for Employees of Maryville University of St. Louis (the "2007 Plan"). (Id., ¶ 7). In May, 2007, Plaintiff was a participant in the 2007 Plan. (Plaintiff's Response to Defendants' Statement of Uncontroverted Material Facts, ¶ 4).

The 2003 Policy contained, among others, the following relevant provisions:

## DISCRETIONARY AUTHORITY

The Policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable, by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto. The plan administrator and other plan fiduciaries have discretionary authority to determine Your eligibility for and entitlement to benefits under the Policy. The plan administrator has delegated sole discretionary authority to Hartford Life Group Insurance Company to determine Your eligibility for benefits and to interpret the terms and provisions of the plan and any policy issued in connection with it....

### *How do We define Disability?*

*Disability* or *Disabled* means that *You* satisfy the Occupation Qualifier or the Earnings Qualifier as defined below.

### Occupation Qualifier

*Disability* means that during the *Elimination Period* and the following 36 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

---

[2] According to Hartford, Hartford Life Group Insurance Company is the predecessor in interest to Hartford Life and Accident Insurance Company. (Hartford's Facts, ¶ 6).

1)  continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; and

2)  not *Gainfully Employed*.

**Earnings Qualifier**

*You* may be considered *Disabled* during and after the *Elimination Period* in any month in which *You* are *Gainfully Employed*, if an *Injury* or *Sickness* is causing physical or mental impairment to such a degree of severity that *You* are unable to earn more than 80% of *Your Monthly Earnings* in any occupation for which *You* are qualified by education, training or experience....

## DEFINITIONS

**Gainful Employment** or **Gainfully Employed** means the performance of any occupation for wages, remuneration or profit, for which *You* are qualified by education, training or experience on a full-time or part-time basis, and which *We* approve and for which *We* reserve the right to modify approval in the future....

**Material and Substantial Duties** means the necessary functions of *Your Regular Occupation* which cannot be reasonably omitted or altered....

**Regular Occupation** means the occupation that *You* are performing for income or wages on *Your Date of Disability*.  It is not limited to the specific position *You* held with *Your* Employer....

(Administrative Record, attached to Plaintiff's Motion for Summary Judgment as Exh. B ("AR"),

at 60, 42, 58, 59).

The 2007 Policy contains, among others, the following relevant provisions:

The benefits described in your booklet-certificate (Booklet) are provided under a group insurance policy (Policy) issued by the Hartford Life and Accident Insurance Company (Insurance Company) and are subject to the Policy's terms and conditions. The Policy is incorporated into, and forms a part of, the Plan.  The Plan has designated and named the Insurance Company as the claims fiduciary for benefits provided under the Policy.  The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy....

## DEFINITIONS

**Disability or Disabled** means You are prevented from performing one or more of the Essential Duties of:

- 3 -

1)      Your Occupation during the Elimination Period[3];
2)      Your Occupation, for the 3 year(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
3)      after that, Any Occupation....

**Essential Duty** means a duty that:
1)      is substantial, not incidental;
2)      is fundamental or inherent to the occupation; and
3)      cannot be reasonably omitted or changed.

Your ability to work the number of hours in Your regularly scheduled work week is an Essential Duty....

**Your Occupation** means Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location....

**Mental Illness And Substance Abuse Benefits:**....
If You are Disabled because of:
1)      Mental Illness that results from any cause;
2)      any condition that may result from Mental Illness;....

Benefits will be payable:
1)      for as long as you are confined in a hospital or other place licensed to provide medical care for the disabling condition; or
2)      if not confined, or after you are discharged and still Disabled, for a total of 24 month(s) for all such disabilities during your lifetime.[4]

---

[3] Under the terms of the Policy, the Elimination Period, meaning "the longer of the number of consecutive days at the beginning of any one period of Disability which must elapse before benefits are payable or the expiration of any Employer sponsored short term Disability benefits or salary continuation program, excluding benefits required by state law," was six months. (2007 Policy and Plan, PP. 7, 18).

[4] Hartford does not dispute the following contention by Plaintiff:

     To be eligible for long-term disability benefits, Mr. Touhey had to be disabled throughout a six month elimination period in which he would not collect benefits. The last day of Mr. Touhey's elimination period was November 17, 2007. His benefits were then collectible for a total period of two years, plus the number of days he was hospitalized for his condition during that two year period, minus the day of discharge. Mr. Touhey was hospitalized two days for his condition on [December] 22 and 23, 2007, and was discharged on [December] 24, 2007. Thus, to be entitled to the full two years and two days of benefits, Mr. Touhey had to show he was disabled between May 18, 2007 and November 19, 2009, and he would be entitled to collect benefits for the period from November 18, 2007 through

(2007 Policy and Plan, attached to Plaintiff's Motion for Summary Judgment as Exhibit A, PP. 53, 18, 21, 10). The 2007 Policy and Plan also contains a provision conditioning the payment of disability benefits upon Hartford's receipt of proof of disability. (Id., PP. 14-15).

Plaintiff filed his application for long term disability benefits with Hartford on or about September 4, 2007. (Hartford's Facts, ¶ 8). Plaintiff alleged that his disability resulted from the aggravation of numerous mental and psychological impairments, including depression and anxiety. (Compl., ¶ 11). Included with the claim was an Attending Physician's Statement of Disability, completed by Susan Minchin, M.D., Plaintiff's treating psychiatrist, on August 27, 2007. (AR 529-530). In her statement, Dr. Minchin noted Plaintiff's primary diagnosis was Major Depressive Disorder, recurrent, and his secondary diagnosis was Coronary Artery Disease. (AR 529). Dr. Minchin indicated Plaintiff's subjective symptoms were increased anxiety, poor concentration, low mood, and low energy level. (Id.). She stated she first treated Plaintiff on November 20, 2001, and met with Plaintiff approximately once every eight weeks, engaging in psychotherapy and prescribing medications to treat Plaintiff's symptoms. (Id.). Dr. Minchin noted Plaintiff exhibited major impairment in several areas, including work and family relations. (AR 530). Finally, she indicated that Plaintiff became unable to work due to his impairment on May 21, 2007, and that she believed the limitations would last indefinitely. (Id.).

On September 13, 2007, Hartford Claims Examiner Timothy Harmon ("Harmon") interviewed Plaintiff by telephone. (Hartford's Facts, ¶ 19). Plaintiff stated that his depression was the only condition disabling him and keeping him from working. (Id., ¶ 20). Plaintiff further

---

November 19, 2009.
(Plaintiff's Statement of Uncontroverted Material Facts in Support of his Motion for Summary Judgment ("Plaintiff's Facts"), ¶ 3 (citations to record omitted)).

indicated that he was working at a winery in Wisconsin 20 to 40 hours per week, and that he did not ever intend to return to work at Maryville. (Id., ¶¶ 23, 24).

Harmon referred Plaintiff's claim to Behavioral Health Case Manager Kathy Justice ("Justice") for review. (Hartford's Facts, ¶ 26). On September 17, 2007, Justice noted that the medical information in the claim file was "insufficient to clarify functional limitations due to mental nervous condition." (Id., ¶ 27, quoting AR 90). She therefore called Dr. Minchin to clarify Plaintiff's functional limitations since his last day worked. (Id.). Justice also interviewed Plaintiff for functionality on September 17, 2007, and Plaintiff indicated that he got really depressed, mentioning a hostile work environment. (Id., ¶¶ 28, 29). Plaintiff stated he did not feel he could do his regular job duties anymore, but was not sure if he could perform his job in a different environment. (Id., ¶ 30). After trying unsuccessfully to solicit more information from Dr. Minchin, on September 25, 2007, Justice concluded as follows: "Current medical information does not support functional limitations due to mental nervous condition. There is no documentation of functional limitations and EE reports he is working for another employer currently 40 hours a week." (AR 86-87).

Justice spoke with Dr. Minchin on October 16, 2007. (Hartford's Facts, ¶ 37). At that time, Dr. Minchin advised she was not sure whether Plaintiff would be able to return to his previous line of work, as she was not sure whether his impairments were permanent. (AR 85). She further advised that while Plaintiff obviously was capable of working for a different employer in a different position, she was unfamiliar with the particulars of Plaintiff's position at the winery. (Id.). Dr. Minchin then provided Hartford with more information on October 22, 2007, stating Plaintiff exhibited poor concentration, high levels of anxiety, and impaired reasoning and judgment. (AR 498). She rated Plaintiff's Global Assessment of Functioning ("GAF") score as 45/65, but

acknowledged "Patient has had a normal mental status exam in the past when there is no exacerbation of his illness." (AR 499). Dr. Minchin concluded that at no time from May 17, 2007, to October 22, 2007, was Plaintiff able to perform his regular job duties for another employer, or work in another position for this employer. (AR 498). As for the expected duration of Plaintiff's illness, Dr. Minchin stated: "Unknown. Impairment should improve as depression responds to treatment." (AR 500).

On November 12, 2007, Dr. Minchin provided Plaintiff's medical records and her office notes. (Hartford's Facts, ¶ 42). The office notes showed Plaintiff had office visits to Dr. Minchin on May 16, 2007, August 11, 2007, and September 14, 2007, and telephone consultations on June 20, 2007, and July 23, 2007. (Id., ¶ 43). After reviewing the office notes, on November 13, 2007, Justice found Plaintiff's mental status examinations were "fairly unremarkable," indicating only "occasional circumstantial/negative/tangential thoughts and restricted/anxious affect. Work issues noted which would not connote an impairment." (Id., ¶ 44, AR 81). Due to the discrepancy between reported functionality and Plaintiff's claimed disability, Justice recommended a medical consultant review. (Id., ¶ 45).

Hartford sent Plaintiff's file to Donald Wiger, Ph.D and Licensed Psychologist, for review. (Hartford's Facts, ¶ 46). After reviewing Plaintiff's claim file and medical records, and speaking with Dr. Minchin personally[5], Dr. Wiger sent his report on December 4, 2007, concluding as follows:

> On 11/28/07 I was able to speak [with] Dr. Minchin by telephone. Dr. Minchin states that [Plaintiff's] diagnosis is major depressive disorder, recurrent, in partial remission. She further notes that since he is not working in his previous position [t]he depressive symptoms have subsided but he still has bouts of irritability, decreased concentration, sleep problems, and anxiety. She states he was working 20 hours per week but was having difficulties with anxiety; now he works ten hours per week in an unskilled labor position.

_____

[5] Hartford did not conduct an independent medical examination of Plaintiff, despite its right to do so under its policy. (Plaintiff's Facts, ¶ 16, citing 2007 Policy and Plan, P. 15).

Dr. Minchin states that he is not able to return to his previous position. He had been a Fundraiser for 15 years in a very stressful position. She notes that there was a new boss who wanted to hire his own people, leading to a hostile environment, which is too stressful for Mr. Touhey.

He is now taking Effexor XR, 225 mg and Lexapro, 20 mg. He has a phone conversation with Dr. Minchin once every four weeks and has office appointments once every three months. He is currently in Michigan and he does not receive any mental health counseling....

A 10/8/07 report from Dr. Minchin noted that Mr. Touhey was irritable but cooperative. On a 9/14/07 visit, his GAF score was 45 with the highest GAF in the past year of 65. Increased anxiety, poor concentration, interval insomnia, low mood, and feelings of hopelessness were noted. Functionality was noted as impaired, secondary to the claimant's serious, chronic mental illness and psychosocial stressors leading to worsening of his mental illness. It is further noted impairment should improve as depression responds to treatment. Stressors for the claimant were noted with conflict, hostile environment, coronary heart disease, and other stressors the claimant experiences.

Dr. Minchin noted that Mr. Touhey has the full ability to work alone but some moderate difficulties were noted in planning activities, expressing personal feelings, and working under specific instructions. He had the minimal ability in working under stress, dealing with people, making decisions, and other more complex activities and had no ability to influence people. Mr. Touhey was referred to an EAP program. Medications at that time included Effexor XR, Lexapro, and Ambien. He reportedly had a partial response to medications, which were to continue to be adjusted. It was unknown when the claimant would be able to return to work....

A 9/13/07 claimant interview noted that Mr. Touhey stated that he sees Dr. Minchin every three months. He adds that the depression is the only condition impairing him and keeping him from working. He is currently staying in Wisconsin to relieve his anxiety and to just get away. He states he is anxious and depressed and has difficulty getting out of bed in the morning. He is home by himself in the evening. He is currently working 20 to 40 hours per week at the winery because it is the busy season, but his hours will decrease as business drops off. He had settled on a severance package when he left Maryville three months prior. He stated he did not plan to ever return to work in his previous position and was officially terminated on 9/7/07.

He states that he was depressed because he was in a hostile work environment. He lost his self-esteem and it was hard going back to work. He felt overwhelmed. He took a family leave and thought about going back to work but his depression got worse. He noted his symptoms were high blood pressure, anxiety, stress, weight gain, and difficulty sleeping. Currently, he reports having improved since being away from work. He still has depression and difficulty getting out of bed

but does not feel as overwhelmed as he had in the past. He had a fairly good energy level. He denied current problems with relationships, reading, driving, sleeping, and he has not applied for Social Security Disability. He was working part-time at a winery and was currently working 40 hours per week in October but stated his hours would decrease. He was doing okay working 40 hours per week. He states he could not do his regular job duties anymore. He was not sure if he could do his job under a different environment....

There was no evidence of ongoing psychotherapy, nor evidence of more intensive treatment such as psychiatric hospitalizations.[6] There was little evidence of ongoing treatment other than medication management once every three months. This level of treatment is not consistent with a mental health condition causing limitations and restrictions.

More recently, there is no evidence of limitations and restrictions in his new position such as decreased attendance or difficulty getting along with coworkers or customers. He was able to work up to 40 hours per week when business was most active. This level of activity and ability to work is not consistent with a mental health condition causing limitations and restrictions.

(AR 491-494). Hartford then relied on the provisions of the 2003 Policy and 2003 Plan (Plaintiff's

Facts, ¶ 5), and denied Plaintiff's claim in a letter dated December 20, 2007, as follows:

We have completed our review of your claim for benefits and have determined that you do not meet the policy definition of Disability. Because of this, Long Term Disability (LTD) benefits are not payable to you under the terms of this policy.

Please refer to your policy on page 7, which states:

"How do We define Disability?
Disability or Disabled means that You satisfy the Occupation Qualifier or the Earnings Qualifier as defined below.

Occupation Qualifier
Disability means that during the Elimination Period and the following 36 months, Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:

---

[6] Plaintiff notes that although Dr. Wiger's report makes clear a psychiatric hospitalization may have changed his opinion, Hartford never provided him with evidence of Plaintiff's three day psychiatric hospitalization, from December 22, 2007, to December 24, 2007, nor did it ask him to reevaluate Plaintiff's claim in light of the medical observations rendered during that stay. (Plaintiff's Statement of Additional Uncontroverted Material Facts, ¶ 1).

1)  continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and
2)  not Gainfully Employed.

After the LTD Monthly Benefit has been payable for 36 months, Disability means that Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:
1)  continuously unable to perform the Material and Substantial Duties of any occupation for which You are or become qualified by education, training or experience; and
2)  not Gainfully Employed.

Earnings Qualifier
You may be considered Disabled during and after the Elimination Period in any month in which You are Gainfully Employed, if an Injury or Sickness is causing physical or mental impairment to such a degree of severity that You are unable to earn more than 80% of Your Monthly Earnings in any occupation for which You are qualified by education, training or experience. On each anniversary of Your Disability, We will increase the Monthly Earnings by the lesser of the current annual percentage increase in CPI-W, or 10%.

You are not considered to be Disabled if You are able to earn more than 80% of Your Monthly Earnings, Salary, wages, partnership or proprietorship draw, commissions, bonuses, or similar pay, and any other income You receive or are entitled to receive will be included. Sick pay and salary continuance payments will not be included. Any lump sum payment will be prorated, based on the time over which it accrued or the period for which it was paid....

Please refer to your policy on page 24, which states:
"Regular Occupation means the occupation that You are performing for income or wages on Your Date of Disability. It is not limited to the specific position You held with Your Employer."

Please refer to your policy on page 23, which states:
"Material and Substantial Duties means the necessary functions of Your Regular Occupation which cannot be reasonably omitted or altered."

"Elimination Period means the number of calendar days at the beginning of a continuous period of Disability for which no benefits are payable. The Elimination Period is shown in the Schedule of Benefits."

Page 3, which states:
"Elimination Period:  180 Days"....

The information in your file shows that you last worked for Maryville University of Saint Louis on 05/17/2007. To receive LTD benefits, you must meet the definition

of Disability above. In order to do this, you must be unable to perform the duties of Your Occupation. The Job Description and other Employer information in your file show that Your Occupation requires frequent sitting, with occasional standing, walking, and keyboard use/repetitive hand motion, and that your job can be performed by alternating between sitting and standing. You must also be able to interact verbally and in writing with others.

During a phone conversation with you on 09/13/2007, you stated that due to your depression that was building up prior to your last date worked, you decided that you could no longer return to work for your employer. You also stated that you spend time with friends throughout the day and were currently working between 20 to 40 hours per week at a winery. You also confirmed receiving medical care from Dr. Minchin once every three months.

The medical information submitted by Dr. Minchin shows that due to poor concentration, high level of anxiety, and impaired reasoning and judgment as of 05/17/2007 you were advised to cease working. During your visit to Dr. Minchin on 09/14/2007 she noted that you had increased anxiety, poor concentration, interval insomnia, low mood, and feelings of hopelessness. She described your functionality as impaired secondary to your serious, chronic mental illness and psychosocial stressors leading to worsening of your mental illness. She further noted that your impairment should improve as your depression responds to treatment.

Your claim was reviewed by Dr. Donald Wiger, Ph.D, Independent Medical Reviewer. Dr. Wiger concluded that the evidence available for his review does not support the presence of functional restrictions and limitations. There is evidence that you are receiving medication management only once every three months. Your mental status examinations are not grossly abnormal, and you are not showing significant difficulty in completing your activities of daily living to support any limitations or restrictions in your functionality. Also, there is no evidence of limitations and restrictions in your new position, and you were able to work up to 40 hours per week when business was most active for the winery.

We have concluded from the combination of all the medical information in your file that you are able to perform frequent sitting, with occasional standing, walking, and keyboard use/repetitive hand motion, and that your job can be performed by alternating between sitting and standing, and interact verbally and in writing with others.

We compared this information to the Material and Substantial Duties of Your Occupation as a Development Director. Based on this information, we have concluded that you are able to perform these duties.

We considered all of the evidence in your claim file in making our decision. The LTD policy states that benefits are payable if you are Disabled throughout and beyond the policy's Elimination Period. The combined information in your file does

not show that you are unable to perform the Material and Substantial duties of Your Occupation on a full time basis as of 05/17/2007. Because of this, we must deny your claim for LTD benefits.

(AR 18-20).

On December 22, 2007, Plaintiff voluntarily requested admission to the psychiatric unit of Barnes-Jewish Hospital. (AR 269). Dr. Kimberly Chik assessed Plaintiff's GAF score as 30, and placed him on suicide, elopement, and assault precautions. (AR 280). Plaintiff was discharged from the hospital on December 24, 2007. (AR 268).

Plaintiff appealed Hartford's December 20, 2007, decision in a letter from counsel dated June 19, 2008. (AR 351-356). With his appeal, Plaintiff enclosed job descriptions from his Development Director and winery positions. General functions for the Development Director position included:

1. For the School of Health Professions: serve as liaison for the Office of Institutional Advancement; identify and contact prospects; develop relationships with prospects; write plans for solicitations; be involved with developing and strengthening the Dean's Council; meet with the dean on a regular basis; attend as many SHP faculty and program meetings as possible; and attend as many SHP functions as possible at which SHP alumni might be in attendance.

2. Interact with Director of Advancement Services, Director of Alumni Relations and Assistant Director of Development (Annual Fund) to generate mailing lists, update and maintain prospect tracking information and cultivate alumni prospects.

3. For planned giving prospects: identify and contact prospects; develop relationships with these prospects; write plans for solicitations; close planned gifts; coordinate Mouton Society lists and activities.

4. Market charitable gift annuities in newsletters, in direct mail letters and in face-to-face meetings with prospects; steward the income which flows to the annuitants; manage tax-reporting materials required for tax purposes.

5. Market bequests; charitable remainder unitrusts (CRUTs) and annuity trusts (CRATs) through newsletters, direct mail letters and face-to-face meetings with prospects.

6. Sponsor cultivation events on and off campus, including nights and weekends.

7. Travel as needed in and around St. Louis and around the country to visit and solicit prospects.

8. Perform other duties as assigned.

(AR 359). Qualifications for the position included the following: Bachelor's degree; 5-10 years development experience, preferably in a not-for-profit sector; excellent interpersonal and communication skills, including presentation skills; understanding of analytical tools utilized in planned giving presentations preferred; computer literacy; flexibility to work evenings and weekends as needed; and travel to visit prospects required. (AR 360). By way of contrast, job duties for the position of Wine Server at Simon Creek Winery included the following: Turning on the lights in the area of the tasting bar; cleaning the top of the bar with disinfectant; opening the wine bottles that will be used for tasting purposes; making sure there are wine crackers, napkins, and clean tasting glasses available; greeting customers as they approach the tasting bar; and cleaning the bar area after customers leave. (AR 361). Plaintiff further included records from St. Joseph's Hospital, 46 pages of certified records from Dr. Minchin, and a June 16, 2008, letter in which Dr. Minchin wrote the following regarding Plaintiff's disability:

> As stated in the form contained within a letter written to me from Kathy L. Justice RN of the Hartford Life and Accident Insurance, it is my medical opinion that Mr. Touhey would <u>not</u> be able to perform his regular job duties for another employer or any similar duties for his current employer.
>
> In the Attending Physician's Statement of Disability dated 10/22/2007, in my medical judgment Mr. Touhey's ability to perform a number of job-related activities has been seriously impaired by the current exacerbation of Major Depressive Disorder which Mr. Touhey is experiencing. Mr. Touhey is current[ly] <u>unable</u> to influence people in their opinions, attitudes and judgments. His illness has <u>severely impaired</u> his ability to direct, control, or plan activities of others; to perform a variety of duties; to perform effectively under stress; to attain precise set limits, tolerances, and standards; to deal with people; and to make judgments and decisions. <u>Moderate</u>

impairment in expressing personal feelings and working under specific instructions is also present....

In general, severe forms of psychiatric illness can affect every function for which the cerebellum is responsible. The cerebellum is the only organ responsible for all executive functions of the brain, including attention, concentration, memory, reasoning, logic, critical analysis and decision-making. It is the exquisite interplay between all these functions that makes each individual unique in their cognitive abilities. Depression, even in mild forms, impairs memory, attention, memory, reasoning, logic, critical analysis and decision-making. Thus, depression is capable of changing every executive function of the cerebellum.

Mr. Touhey has been under my care since November 2001. I have evaluated his degree of illness, evaluated his medication regiment and provided psychotherapy for him over the past seven years. In my medical judgment, within medical certainty, James Michael Touhey is disabled by his psychiatric illness with respect to performing the duties and responsibilities of his job position with Maryville University of Saint Louis.

(AR 357-358). Plaintiff's attorney submitted additional records on August 8, 2008, including medical records from the psychiatric hospitalization that Plaintiff underwent in St. Louis from December 22, to December 24, 2007. (AR 259-349). Plaintiff's attorney again submitted records on September 16, 2008, including those from an emergency room visit on August 25, 2008. (AR 238-254).[7]

On August 25, 2008, Hartford Appeal Specialist Joye M. Kelly wrote Dr. Minchin, informing her that as part of the evaluation process a physician from MES Solutions would contact her for clarification of Plaintiff's medical status and function. (AR 103). On September 16, 2008, Michael A. Rater, M.D. (psychiatrist), of MES Solutions, submitted a Peer Review Report on Plaintiff. (AR 26-31). Dr. Rater indicated that he had reviewed all medical records provided, together with Plaintiff's most recent self-reported statements of functionality. (AR 26). With respect to Dr.

---

[7] Plaintiff contends the August 25, 2008, emergency room visit was precipitated by a panic attack. (Plaintiff's Facts, ¶ 34). Hartford counters the reason for the admission was a suspected heart attack. (Hartford's Response to Plaintiff's Facts, ¶ 34).

Minchin, Dr. Rater stated as follows: "I left Dr. Minchin a message on September 4, 2008 at 6:15 PM EDST. I left Dr. Minchin a message on September 5, 2008 at 11:15 AM EDST. I left Dr. Minchin a message on September 8, 2008 at 2:50 PM EDST. No calls were returned." (Id.). After summarizing Plaintiff's medical records, Dr. Rater concluded that the submitted data did not support Plaintiff's having any psychiatric limitations or restrictions preventing him from carrying out the demands of a Developmental Director. (AR 31). Specifically, Dr. Rater found as follows:

> Mr. Toughey [sic] has had chronic problems with depression that he has been able to manage. He was able to work at a job in Wisconsin roughly the same time as his statements of functional impairment. His work issues are related to workplace factors and a conflict with his supervisor rather than a pervasive and continuous mental disorder.

(Id.). Dr. Rater submitted a second Peer Review Report on October 6, 2008, in which he indicated that he had reviewed the records provided by Plaintiff's attorney on September 16, 2008. (AR 24). After again stating he was unable to establish contact with Dr. Minchin, Dr. Rater concluded that the attached information did not alter his prior assessment, as follows:

> I had assessed Mr. Touhey as having a mental health condition related to specific events, rather than a pervasive condition, and the records are consistent with this, referring to "situational depression" for Mr. Touhey. There are no mental status exams in the attached records....Mental health care notes with mental status exams and discussion of functioning and daily activities would help give an understanding of the claimant's medical status and function.

(Id.). Hartford then affirmed its denial of Plaintiff's claim in a letter dated October 28, 2008, in relevant part as follows: "Although we agree that Mr. Touhey may have bouts of situational depression, in spite of his symptoms he manages to perform his activities of daily living including working, and his self reported symptoms do not represent a continuous period of disability as of 5/18/07 to the present. Any subsequent worsening and/or new condition would not be considered." (AR 17).

On February 3, 2009, Dr. Minchin sent Plaintiff's attorney a letter, in which she maintained that contrary to Dr. Rater's assertion, the two physicians had spoken about Plaintiff's health and ability to function on both September 17, and October 13, 2008. (AR 194). Dr. Minchin then expressed her disagreement with Hartford's conclusion in strong terms, as follows:

[Dr. Rater and I] discusse[d] Mr. Touhey's mental status at the time of his last appointment. We also discussed Mr. Touhey's cognitive abilities with respect to his responsibilities at his former position at Maryville University and with respect to his responsibilities at his job in Wisconsin during the summer months. I emphasized the depressive symptoms Mr. Touhey has been experiencing and their negative effect on his cognitive functioning. At no point during these conversations did I opine Mr. Touhey is capable of performing the duties of his position with Maryville University. Neither my office notes nor my conversation with Dr. Rater support the psychologist's [sic] conclusion that Mr. Touhey is not experiencing psychiatric limitations or restrictions.

I am very concerned about the statement that is made later in the [October 28, 2008, letter from Hartford] regarding Mr. Touhey's ability to function in his job as Development Director (Does Dr. Rater have the job description for this position?) The position of Development Director for an university is an executive level job requiring exquisite skills in a variety of complex functions of the brain. His job involves face to face contact with potential donors during which time he must "encourage" people to donate gifts of $100 to $1,000,000 dollars. In addition, he is expected to produce or generate a certain dollar amount of gifts for the university for each year he is working. This type of work requires excellent interpersonal skills, excellent reasoning skills, excellent persuasion skills and sound judgment.

Now compare his former job of Development Director to the job Mr. Touhey held in Wisconsin. This job involved greeting visitors/customers and stocking shelves. Mr. Touhey also poured beverages for any visitor that requested a beverage. This job requires a minimum of skill in the higher cognitive functions of the brain and in fact, is considered unskilled labor position. Mr. Touhey has been able to function in this unskilled labor position. However, when he began orientation for another position with his employer, he was unable to even finish the orientation for this position as his anxiety levels rose, his concentration waned considerably and his confidence suffered.

Most significantly, I am particularly disturbed by Dr. Rater's willingness to offer a clinical opinion about Mr. Touhey's mental status and capabilities without examining Mr. Touhey himself. Determinations with respect to the ability to perform various cognitive tasks are not made with the aide of a rating scale or testing format with which one could rate a patient on his cognitive abilities, unlike the examination on mathematical principles for which a patient's knowledge and capabilities can be

deduced. The determination of ability to perform executive tasks requires detailed
knowledge of the patient. This detailed knowledge cannot be adequately expressed
in clinical notes.

(AR 194-195). Plaintiff's attorney forwarded Dr. Minchin's letter to Hartford on April 30, 2009,

together with a demand that Hartford reconsider its denial of Plaintiff's claim in light of Dr. Rater's

alleged misrepresentation. (AR 188-190).

On May 27, 2009, Justice requested an additional report from Dr. Rater, incorporating his

opinion regarding Dr. Minchin's letter. (Hartford's Facts, ¶ 75). Dr. Rater completed a final Peer

Review Report on June 5, 2009. (AR 22-23). At that time, Dr. Rater acknowledged speaking with

Dr. Minchin on June 3, 2009[8], and described their discussion as follows:

> [Dr. Minchin and I] discussed her opinion that Mr. Touhey's previous position
> required a higher level of mental functioning than the job in Wisconsin at which he
> is noted to be working. Dr. Minchin reported that Mr. Touhey was involved in
> moving, which involved getting material items out of one house, and going through
> the sales process and moving into his wife and his new home. I asked her if moving
> wasn't a complicated task with multiple cognitive tasks required, and she stated that
> this was true, though she did not know how Mr. Touhey and his wife shared the
> responsibilities.[9] She reported that she continued to treat him for depression, and she
> continued to assess his depression as impairing his cognitive and social functions
> such that he was not able to work in his previous position.

(AR 22). Dr. Rater then stated his discussion with Dr. Minchin did not change his opinion regarding

Plaintiff and his work capacity, as follows:

> [Dr. Minchin] assesses him based on her knowledge of him as not having the
> cognitive abilities or social skills necessary to work at his former position. I continue
> to note that Mr. Touhey has long standing chronic mood issues that did not impair

---

[8] Dr. Rater did not acknowledge having spoken with Dr. Minchin on two prior occasions,
nor did he explain why no mention was made of their September 17, 2008, conversation in his
second Peer Review Report.

[9] Plaintiff contends he had an emotional breakdown during the move, and his wife had to
take over driving household items to Wisconsin and directing the work of those unloading other
items. (Plaintiff's Response to Hartford's Facts, ¶ 77; Plaintiff's Statement of Additional
Uncontroverted Material Facts, ¶ 8).

his cognitive and social abilities for a number of years. He had workplace issues with his supervisor that did not stem from a psychiatric condition on his part, and he shows with his ability to work in Wisconsin and in the time and efforts he is devoting to moving that he has the intellectual ability, energy and task persistence necessary to work.[10]

(Id.). Based on the foregoing, Hartford denied Plaintiff's request for reconsideration in a letter dated

June 9, 2009, in relevant part as follows:

> Dr. Rater opined following review of the information presented that the report and discussion with Dr. Minchin does not change his prior opinion regarding Mr. Touhey and his work capacity. Dr. Rater opined that Dr. Minchin assesses Mr. Touhey based on her knowledge of him as not having the cognitive abilities or social skills necessary to work at his former position. Dr. [Rater] reported that he continues to note that Mr. Touhey has long standing chronic mood issues that did not impair his cognitive and social abilities for a number of years noting further that Mr. Touhey had workplace issue[s] with his supervisor that did not stem from a psychiatric condition on his [part] and he shows with his ability to work in Wisconsin and in the time and efforts he is devoting to moving that he has the intellectual ability, energy and task persistence necessary to work.

> The prior reviewing physician, Dr. Donald Wiger, PhD, was of the opinion as well following review of the information presented and discussion with Dr. Minchin that the evidence available for review does not support the presence of functional restrictions and limitations. The evidence suggests that Mr. Touhey reported many stressors in his previous work environment subsequently going to work in Wisconsin at a winery.

> Dr. Wiger concluded by stating there was no evidence of ongoing psychotherapy, nor evidence of more intensive treatment such as psychiatric hospitalizations[11], and little evidence of ongoing treatment other than medication management with the psychiatrist once every three months and speaking with the psychiatrist monthly however does not receive any mental health counseling and noted that this level of

---

[10] Plaintiff complains that while both Dr. Wiger and Dr. Rater set forth Dr. Minchin's opinions in detail, including her assessment that Plaintiff's mental illness rendered him completely unable to influence people and caused other severe impairments, the file examiners then ignored her analysis and conclusions without explanation. (Plaintiff's Facts, ¶ 19).

[11] Hartford again relied on Dr. Wiger's assessment that Plaintiff was not limited because he did not engage in more intensive treatment, such as a psychiatric hospitalization, despite Hartford's knowledge that Plaintiff underwent such a hospitalization between December 22, 2007, and December 24, 2007.

treatment is not consistent with a mental health condition causing restrictions and limitations.

Based on the totality of the information presented that included appeals independent review of the information presented, review and reports from the Medical Consultant's of whose opinion's and expertise we further relied on, the opinion of Dr. Minchin, Mr. Touhey's own treating physician, and Mr. Touhey's self-reported symptoms and activities of daily living, Appeals finds the previous decision of December 20, 2007, to be correct and proper and remains unchanged. Again, although we agree that Mr. Touhey may have bouts of situational depression, in spite of his symptoms he manages to perform his activities of daily living including working, his treatment is not consistent with a mental health condition causing functional restrictions and limitations and appears to be more of an employment issue verses one of disability.

(AR 13-14).

Plaintiff filed his Complaint with this Court on August 6, 2010, claiming that by wrongfully refusing to pay him benefits Hartford violated ERISA and the underlying provisions of the Plan and Policy. (ECF No. 1). Plaintiff and Hartford originally filed competing Motions for Summary Judgment on May 7, 2012. (ECF Nos. 43, 44). Hartford conceded, however, that in analyzing Plaintiff's claim it had erroneously relied on the provisions of the 2003 Policy and 2003 Plan, rather than the 2007 Policy and 2007 Plan. The Court therefore remanded this case to the administrator on July 3, 2012, with directions to reevaluate Plaintiff's claim for benefits under the terms and provisions of the 2007 Policy and 2007 Plan. (ECF No. 64).

In a letter dated September 11, 2012, Hartford once again denied Plaintiff's claim for benefits, as follows:

The policy provisions state on Page 19 the following:

"Disability or Disabled means You are prevented from performing one or more of the Essential Duties of:
1)      Your Occupation during the Elimination Period;
2)      Your Occupation, for the 3 year(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
3)      after that, Any Occupation.

If at the end of the Elimination Period, You are prevented from performing one or more of the Essential Duties of Your Occupation, but Your Current Monthly Earnings are greater than 80% of Your Pre-disability Earnings, Your Elimination Period will be extended for a total period of 12 months from the original date of Disability, or until such time as Your Current Monthly Earnings are less than 80% of Your Pre-disability Earnings, whichever occurs first.

For the purposes of extending Your Elimination Period, Your Current Monthly Earnings will not include the pay You could have received for another job or a modified job if such job was offered to You by Your Employer, or another employer, and
You refused the offer.

Your Disability must result from:
1)      accidental bodily injury;
2)      sickness;
3)      Mental Illness;
4)      Substance Abuse; or
5)      pregnancy....

"Essential Duty means a duty that:
1)      is substantial, not incidental;
2)      is fundamental or inherent to the occupation; and
3)      cannot be reasonably omitted or changed.

Your ability to work the number of hours in Your regularly scheduled work week is an Essential Duty".

Referring to Page 20 of the policy states: "Mental Illness means a mental disorder as listed in the current version of the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association. A Mental Illness may be caused by biological factors or result in physical symptoms or manifestations....

Referring to Page 21 of the policy, "Your Occupation means Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing with a specific employer or at a specific location"....

The policy provisions state that Mr. Touhey must be prevented from performing one or more of the essential duties of his occupation during and following the Elimination Period in which under the terms of this policy is a continuous period of 6 months....

The past medical reviews conducted by Mr. Donald Wiger and Dr. Michael A. Rater, reveal that both reviewers were in agreement that Mr. Touhey does not present with functional restrictions and/or limitations. Based on his ability to work at a winery with co-workers and the public, there were no noted issues. That included maintaining the required work hours. Both Mr. Wiger and Dr. Rater opined that Mr.

Touhey's level of function did not demonstrate that he is functionally limited on the basis of a mental health condition. Dr. Rater noted as well that Mr. Touhey's work issues with his employer, Maryville University of Saint Louis, were related to workplace factors and a conflict with his supervisor rather than a pervasive and continuous mental disorder.

Dr. Wiger concluded his review by stating there is no evidence of ongoing psychotherapy, nor evidence of more intensive treatment such as psychiatric hospitalizations, and little evidence of ongoing treatment other than medication management with the psychiatrist once every three months and speaking with the psychiatrist monthly. Mr. Touhey did not receive any mental health counseling and Dr. Wiger noted that the level of treatment that Mr. Touhey received was not consistent with a mental health condition that would cause functional restrictions and limitations.

Based on the appeal review of the information presented, the opinion of Dr. Minchin, the opinion of Mr. Wiger and Dr. Rater, we find that Mr. Touhey did not present with functional restrictions and limitations as of May 17, 2007 and continuing throughout the 6 month elimination period to the present and therefore he does [not] meet the definition of disability as defined in the terms of this policy to be eligible for benefits.

This rationale is concluded by considering Dr. Minchin's opinion, the level of treatment that Mr. Touhey received and/or may continue to receive, the opinions of the Medical Consultant's Mr. Wiger and Dr. Rater and Mr. Touhey's activities of daily living as of the time period in question. Mr. Touhey did not present with any medical condition(s) that would have reasonably be expected to require a higher level of treatment and that would have demonstrated that he would have been precluded from performing his occupation as a Developmental Director for Maryville University of Saint Louis and/or in the same occupational capacity with any other employer. During the time period in question Mr. Touhey was able to maintain his activities of daily living that included working full time in a winery as a server.

Albeit the level of function intellectually and cognitively as a server at a winery is not comparable to the position of Developmental Director for a University, in combination with the level of treatment Mr. Touhey received and his ability to maintain a normal level of function in his activities of daily living, the conclusion remains that Mr. Touhey was capable of performing his regular occupational work activity whether with the Maryville University of Saint Louis as a Developmental Director or any other employer in that same capacity. We must also agree with Dr. Rater's opinion that Mr. Touhey's work issues were related to workplace factors and a conflict with his supervisor which may have been a catalyst to his work stoppage rather than a pervasive and continuous mental disorder supported by the medical findings of fact.

Therefore, based on the contractual provisions of the Maryville University of Saint Louis LTD Policy, the decision to deny benefits remains unchanged.

(ECF No. 74-9).

As stated above, Plaintiff and Hartford filed the instant competing Motions for Summary Judgment on December 3, 2012. (ECF Nos. 67, 71). As support for his motion, Plaintiff asserts Hartford did not engage in the required analysis upon remand. (Plaintiff's Response to Hartford's Facts, ¶ 83). Specifically, Plaintiff notes that in violation of the requirements of its own claims manual, Hartford never determined whether Plaintiff could fulfill the non-exertional demands of his job, including "non-physical requirements such as the mental or behavioral temperaments of a work situation." (Plaintiff's Facts, ¶ 24, quoting Plaintiff's Exh. C, P. 117).[12]

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at

---

[12] According to the claims manual, non-exertional demands include directing, controlling or planning activities of others, dealing with people, and making judgments or decisions. (Plaintiff's Exh. C, P. 117).

247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id.* at 249.

## **STANDARD OF REVIEW**

The Eighth Circuit has held that, "[u]nder ERISA, a plan participant may bring a civil action to 'recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" *Pralutsky v. Metropolitan Life Ins. Co.*, 435 F.3d 833, 837 (8th Cir.), quoting 29 U.S.C. § 1132(a)(1)(B), *cert. denied*, 549 U.S. 887 (2006). "The district court reviews de novo a denial of benefits in an ERISA case, *unless* a plan administrator has discretionary power to construe uncertain terms or to make eligibility determinations, when review is for abuse of discretion." *Rittenhouse v. UnitedHealth Group Long Term Disability Ins. Plan*, 476 F.3d 626, 628 (8th Cir. 2007) (emphasis in original) (citation omitted). *See also King v. Hartford Life and Acc. Ins. Co.*, 414 F.3d 994, 998-999 (8th Cir. 2005) (internal quotation marks and citations omitted) ("Where a plan gives the administrator discretionary power to construe uncertain terms or to make eligibility determinations, however,....the administrator's decision is reviewed only for abuse....of his discretion, and the administrator's interpretation of uncertain terms in a plan will not be disturbed if reasonable.").

In the instant case, because as noted above the 2007 Plan allotted Hartford the discretionary authority to determine eligibility for benefits, the standard of review for this Court is abuse of discretion.[13]

> Under the abuse of discretion standard, the proper inquiry is whether the plan administrator's decision was reasonable; *i.e.*, supported by substantial evidence. In considering the reasonableness of a plan administrator's fact-based disability determination, courts should consider whether the decision is supported by substantial evidence. Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001) (internal quotation marks and citations omitted). "If substantial evidence supports the decision, it should not be disturbed even if a different, reasonable interpretation could have been made." *Downey v. Hartford Life Group Ins. Co.*, 752 F.Supp.2d 1083, 1087 (W.D. Mo. 2010) (internal quotation marks and citation omitted). *See also Wilcox v. Group Health Plan, Inc.*, 2009 WL 910695 at *8 (E.D. Mo. Mar. 31, 2009) (under the abuse of discretion standard, the court will reverse the plan administrator's decision only if it was arbitrary and capricious). In making this determination, "a reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales." *King*, 414 F.3d at 999 (internal quotation marks and citation omitted).

## DISCUSSION

Upon consideration of the record before it, the Court finds the Plan Administrator abused its discretion in denying Plaintiff long-term disability benefits, for several reasons.

---

[13] Plaintiff asserts that procedural irregularities in the manner in which Hartford handled his claim trigger a less deferential standard of review. The Court finds it unnecessary to resolve this issue, however, as it concludes Hartford's decision cannot stand even when reviewed for abuse of discretion. *See Wrenn v. Principal Life Ins. Co.*, 636 F.3d 921, 924-25 (8th Cir. 2011).

# I.    Inappropriately Selective Consideration Of Evidence

Upon review, the Court finds troubling the fact that Hartford continually relied upon the paper-review reports of its experts (consultants), despite their internal inconsistencies, while giving scant weight to the contrary, more detailed, and consistent reports of Plaintiff's treating physician, Dr. Minchin. *See Schwarzwaelder v. Merrill Lynch & Co., Inc*, 606 F.Supp.2d 546, 558 (W.D. Pa. 2009). This reliance is especially disturbing because Hartford, "had discretion to supplement the medical evidence with an independent medical evaluation ("IME") but elected to forego other personal evaluation of Plaintiff's mental health." *Id.* at 558-59; *see also* 2007 Policy, P. 15 ("To assist Us in determining if You are Disabled,....We have the right to require You to:....be examined by a Physician, vocational expert, functional expert, or other medical or vocational professional of Our choice.").[14]

## A.    Dr. Minchin

ERISA plan administrators are not required to accord special deference to the opinions of treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). They may not, however, "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834. In the instant case, it appears Hartford's claims examiners did just that in denying Plaintiff's claim.

As outlined in great detail above, Dr. Minchin consistently opined that Plaintiff was unable to continue in his present position with Maryville. *See, e.g.*, AR 530 (noting Plaintiff became unable to work due to his impairment on May 21, 2007, and that the limitations would last indefinitely); AR

---

[14] "[A] decision to forego an IME and conduct only a paper review, while not rendering a denial of benefits arbitrary *per se*, is another factor to consider in the Court's overall assessment of the reasonableness of the administrator's decision-making process." *Schwarzwaelder*, 606 F.Supp.2d at 559 (citing *Glenn v. MetLife*, 461 F.3d 660, 671 (6th Cir. 2006)).

498 (indicating Plaintiff was prevented from performing his job duties due to poor concentration, high level of anxiety, impaired reasoning and judgment, and providing no estimated return to work date). Dr. Minchin expressed her opinion in stronger terms after Hartford's initial denial of Plaintiff's claim, as follows: "[I]n my medical judgment Mr. Touhey's ability to perform a number of job-related activities has been seriously impaired by the current exacerbation of Major Depressive Disorder which Mr. Touhey is experiencing. Mr. Touhey is current[ly] <u>unable</u> to influence people in their opinions, attitudes and judgments. His illness has <u>severely impaired</u> his ability to direct, control, or plan activities of others; to perform a variety of duties; to perform effectively under stress; to attain precise set limits, tolerances, and standards; to deal with people; and to make judgments and decisions. <u>Moderate impairment</u> in expressing personal feelings and working under specific instructions is also present....In my medical judgment, within medical certainty, James Michael Touhey is disabled by his psychiatric illness with respect to performing the duties and responsibilities of his job position with Maryville University of Saint Louis." (AR 357-358). Dr. Minchin offered her final opinion regarding Plaintiff's condition on February 3, 2009, after Plaintiff's appeal was denied, as follows: "I emphasized the depressive symptoms Mr. Touhey has been experiencing and their negative effect on his cognitive functioning. At no point during these conversations did I opine Mr. Touhey is capable of performing the duties of his position with Maryville University. Neither my office notes nor my conversation with Dr. Rater support the psychologist's [sic] conclusion that Mr. Touhey is not experiencing psychiatric limitations or restrictions." (AR 194).

Hartford afforded Dr. Minchin's assessments little to no credit in issuing its denials, instead relying almost exclusively on the opinions of its paid file reviewers. Hartford offered no rationale for its decision to disregard Dr. Minchin's conclusions, and "[t]he Courts have frequently expressed

concern where, as here, the administrator denies a claim with reliance on the reports of paper-review consultants, in opposition to the treating and examining physicians' consistent and concurring opinions that the claimant is disabled." *Schwarzwaelder*, 606 F.Supp.2d at 559 (citations omitted). *See also Winkler v. Metropolitan Life Ins. Co.*, 170 Fed.Appx. 167, 168 (2nd Cir. 2006) (vacating decision as arbitrary when it was based "entirely on the opinions of three independent consultants who never personally examined [plaintiff], while discounting the opinions" of the treating and examining physicians who assessed psychiatric disability, including depression). The Court finds Hartford's failure to address Dr. Minchin's observations in a meaningful manner rendered its denial of Plaintiff's claim arbitrary and capricious.

## B.    Dr. Wiger

As noted above, Hartford forwarded Plaintiff's claim to Dr. Wiger as part of its initial review. As relevant here, Dr. Wiger concluded as follows: "There was no evidence of ongoing psychotherapy, nor evidence of more intensive treatment such as psychiatric hospitalizations. There was little evidence of ongoing treatment other than medication management once every three months. This level of treatment is not consistent with a mental health condition causing limitations and restrictions." (AR 494).[15]

Upon consideration, the Court finds Hartford's reliance on Dr. Wiger's conclusion in its initial denial may have been reasonable. Hartford's continued reliance on the conclusion without alteration in its later decisions was arbitrary and capricious, however, as Hartford had in its possession evidence that Plaintiff later suffered a psychiatric hospitalization, evidence Dr. Wiger himself acknowledged may have changed his opinion.

---

[15] Dr. Wiger further concluded Plaintiff was not disabled based on his ability to perform in his current position as a wine server. (AR 494). The Court addresses the flaw in this reasoning in Section II, *infra*.

## C.   Dr. Rater

The Court finds Hartford's continued reliance on Dr. Rater's conclusions even more troubling.  Under its deferential standard of review, the Court finds Hartford's reliance on Dr. Rater's first, and possibly second reviews, arguably sustainable.  By the time Hartford relied on Dr. Rater's third review, however, it was aware of the discrepancy between his and Dr. Minchin's accounts of their interactions.  In other words, while Dr. Rater stated in his second review that he was unable to establish contact with Dr. Minchin, and lamented the absence of "[m]ental health care notes with mental status exams and discussion of functioning and daily activities," (AR 24), Dr. Minchin countered that the two physicians had spoken on September 17, 2008, and that she addressed Plaintiff's mental health status at that time.  (AR 194).  Dr. Rater did not deny Dr. Minchin's assertion in his final Peer Review Report, and yet Hartford elected to credit his conclusions over hers.

A close reading of Dr. Rater's final report reveals a second flaw in Hartford's decision to rely on his conclusions, as the report itself is internally inconsistent.  Specifically, the Court notes that Dr. Rater based his opinion in part on the fact that Plaintiff allegedly had devoted time and effort to moving, "a complicated task with multiple cognitive tasks required."  (AR 22).  Dr. Rater reached this conclusion despite having acknowledged that the source of his information regarding the move, Dr. Minchin, had no idea how involved or uninvolved Plaintiff was with the planning and execution thereof.  (Id.).[16]  Under these circumstances, the Court finds Hartford's decision to rely on Dr.

---

[16] As noted above, Plaintiff contends he had an emotional breakdown during the move, and his wife had to take over driving household items to Wisconsin and directing the work of those unloading other items.  (Plaintiff's Response to Hartford's Facts, ¶ 77; Plaintiff's Statement of Additional Uncontroverted Material Facts, ¶ 8).

Rater's opinion in denying Plaintiff's claim for benefits was arbitrary and capricious, especially in light of the otherwise undisputed conclusions of his treating physician.

## II.     Failure To Evaluate Non-Exertional Demands Of Development Director Position

As further support for its conclusion that Hartford's denial was an abuse of discretion, the Court notes that Hartford failed to follow the procedures of its own claims manual in processing the claim. Hartford's claims manual requires that in cases of claimants with a mental illness disability, Hartford must consider the "non-exertional demands" of the position, meaning "non-physical requirements such as the mental or behavioral temperaments of a work situation." (Plaintiff's Exh. C, P. 117).

Examples of non-exertional demands include, but are not limited to:

*     Repetitive or short cycle work;
*     Directing, controlling or planning activities of others;
*     Dealing with people;
*     Working alone or apart in physical isolation from others;
*     Making judgments or decisions.

(Id.). Hartford never engaged in an analysis of whether Plaintiff could fulfill the non-exertional demands of his job, despite the fact that Plaintiff submitted the relevant job description as part of his claim. Instead, Hartford continually relied on the fact that Plaintiff was able to work at a winery to support its denial, without ever explaining how the jobs could be considered comparable in any way. By way of contrast, as noted above Dr. Minchin engaged in a detailed comparison of the positions, as follows:

> I am very concerned about the statement that is made later in the [October 28, 2008, letter from Hartford] regarding Mr. Touhey's ability to function in his job as Development Director (Does Dr. Rater have the job description for this position?) The position of Development Director for an university is an executive level job requiring exquisite skills in a variety of complex functions of the brain. His job involves face to face contact with potential donors during which time he must "encourage" people to donate gifts of $100 to $1,000,000 dollars. In addition, he is expected to produce or generate a certain dollar amount of gifts for the university for

each year he is working. This type of work requires excellent interpersonal skills, excellent reasoning skills, excellent persuasion skills and sound judgment.

Now compare his former job of Development Director to the job Mr. Touhey held in Wisconsin. This job involved greeting visitors/customers and stocking shelves. Mr. Touhey also poured beverages for any visitor that requested a beverage. This job requires a minimum of skill in the higher cognitive functions of the brain and in fact, is considered unskilled labor position. Mr. Touhey has been able to function in this unskilled labor position. However, when he began orientation for another position with his employer, he was unable to even finish the orientation for this position as his anxiety levels rose, his concentration waned considerably and his confidence suffered.

(AR 194-195). Under these circumstances, the Court finds that Plaintiff's position as a Development Director was, "by [his] uncontroverted evidence, and even by the job descriptions provided by [his] employer, patently distinguishable from that of a comparatively uneducated, unskilled, low-wage employee (such as a [server at a winery])." *Schwarzwaelder*, 606 F.Supp.2d at 566. "[Hartford's] reliance on consultant's evaluation language that appears to make minimal, if any, distinction suggests another way in which it fell short of a principled and deliberative reasoning process." *Id.*

## CONCLUSION

For the reasons set forth above, the Court concludes Hartford did not engage in a principled reasoning process, either initially or on remand, or reach a reasonable result, but rather abused its discretion in its handling of Plaintiff's claim.[17]

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 67) is **DENIED**.

---

[17] While Plaintiff requests an award of attorney's fees and costs in his Motion for Summary Judgment, he does not provide detailed analysis regarding his entitlement to such. The Court therefore will grant Plaintiff until **Friday, June 7, 2013**, within which to submit a motion requesting an award of attorney's fees and costs. Hartford then will have until **Friday, June 21, 2013**, within which to submit its response to Plaintiff's motion.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No. 71) is **GRANTED**, and Plaintiff is granted an award of long-term disability benefits from November 18, 2007, through November 19, 2009, subject to such offsets as are permitted in the 2007 Plan, together with prejudgment interest.

Dated this <u>20th</u> day of May, 2013.

/s/Jean C. Hamilton
UNITED STATES DISTRICT JUDGE
